**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)**

| | |
|---|---|
| **OXBO, INC.**<br>**33341 Gilmore Road**<br>**Scappoose, OR 97056,** | : <br> : <br> : |
| | : |
| **Plaintiff,** | : |
| | : |
| **vs.** | : |
| | : |
| **KONECRANES NUCLEAR**<br>**EQUIPMENT & SERVICES, LLC**<br>**5300 S. Emmer Drive**<br>**New Berlin, WI 43151** | : <br> : <br> : <br> : |
| | : |
| **Also Serve:**<br>**Konecranes Nuclear Equipment &**<br>**Services, LLC**<br>**c/o National Registered Agents, Inc.**<br>**301 S. Bedford Street, Suite 1**<br>**Madison, WI 53703** | : <br> : <br> : <br> : <br> : <br> : |
| | : |
| **Defendant.** | : |

**Case No.** _3:22-cv-46_____

**Judge** _____

**(Jury Demand Endorsed Hereon)**

---

## COMPLAINT

---

Plaintiff Oxbo, Inc. sometimes d/b/a Oxbo Mega Transport Solutions ("**OXBO**") files this Complaint against Konecranes Nuclear Equipment & Services, LLC ("**KNES**") and, in support of same, OXBO avers and states as follows:

### PARTIES, JURISDICTION AND VENUE

1.      OXBO is an Oregon corporation with a principal place of business at 33341 Gilmore Road, Scappoose, OR 97056.  OXBO specializes in the lifting and moving of heavy industrial equipment.

2.      KNES is a large business manufacturer of nuclear material handling and lifting equipment, including transporters and cranes.  KNES is located at 5300 S. Emmer Dr., New Berlin,

13349940.3

Wisconsin 53151.

3.     This Court has jurisdiction of this action under 28 U.S.C. § 1332(a)(1) as this is an action between citizens of different states and the amount in controversy exceeds $75,000.

4.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and by the agreement of the parties.

## GENERAL ALLEGATIONS

5.     This action arises from a contract under which OXBO provided KNES the transportation and delivery of a 140-ton capacity boom shipyard crane from Manitowoc, Wisconsin to Kittery, Maine.

6.     On or about September 15, 2020, OXBO submitted a Request for Quote Proposal (the "**RFQ**") to KNES  to provide complete turnkey service for the delivery of one (1) complete 140-ton single boom shipyard crane (the "**Crane 38**") from Manitowoc, Wisconsin to Portsmouth Naval Shipyard in Kittery, Maine (the "**Project**").  A true and accurate copy of the RFQ is attached hereto as **Exhibit A**.

7.     Among other price quotes, the RFQ contained a daily rate of additional charges in the event that a delay is caused or stand-by is requested by KNES, beyond the control of OXBO.  These charges were as follows:

- Days 1-6:     $34,970 per day;

- Days 7-13:     $45,170 per day; and

- Days 14+:     $55,340 per day.

*See* Exhibit A, pg. 15.

8.     On or about December 9, 2020, KNES issued to OXBO that certain *Change to Purchase order* (the "**Purchase Order**") wherein KNES agreed to pay OXBO Three Million Five

2

Hundred Twenty-Two Thousand Seven Hundred Fifteen and No/100 Dollars ($3,522,715.00), plus any costs associated with any delays not caused by OXBO, to perform the Project.  A true and accurate copy of the Purchase Order is attached hereto as **Exhibit B.**

9.      Per the terms of the Purchase Order, "Delay days and credit days are cumulative throughout the duration of the project for both OXBO and KNES respectively."  *Id.* at pg. 2.

10.      Per the terms of the Purchase Order, any delays caused by OXBO need to be documented by both parties.  *Id*.

11.      The "Turnover Date" was defined in the Purchase Order as April 30, 2021. *Id.* at pg. 3. The Turnover Date is the date when Crane 38 was supposed to be made available to OXBO. Generally, the schedule starts a day prior to the Turnover Date because OXBO needs to be on site to receive equipment necessary to perform the intended task.

12.      Pursuant to the Purchase Order, the Project was scheduled to take 50 days, including equipment removal and clean up.  Thus, based on the Turnover Date, the Project should have been completed on or before June 18, 2021.

13.      Pursuant to the Purchase Order, Crane 38 was to be "placed on rail" between June 6 and June 7, 2021.  *Id.*  After Crane 38 was placed on rail, there were several days allocated to break down and clean up the equipment before the Project would be considered completed.

14.      The actual date Crane 38 was placed on rail was June 28, 2021, 21-days after the contractually agreed upon date to get Crane 38 on the rails.

15.      The Purchase Order specifically states "OXBO's scope provided for clarity purposes for both OXBO and KNES to review due to extended evaluations, reviews, planning and conferencing between OXBO and KNES.  But does not limit or eliminate previous RFQ details and information provided." *See* Exhibit B, Pg. 1.

16.     Regarding delays, the Purchase Order states:

Any delays caused by OXBO after the turnover date will be documented by both parties and time added to back end.  Any delays caused by OXBO that "trip" KNES LD's with KNES customer will be charged back to OXBO or purchase order reduced for the LD amount of $9,975 per calendar day of delay, up to but not exceeding 5% of OXBO's total contract price.

If the turnover date . . . is delayed by KNES or KNES customer for any reason beyond the control of OXBO, KNES agrees to pay OXBO $34,970/day (Days 1-6), $45,170/day (Days 7-13), $55,340/day (Days 14+).

Delay days and credit days are cumulative throughout the duration of the project for both OXBO and KNES respectively.

*See* Exhibit B, pgs. 1-2.

17.     Prior to moving Crane 38, OXBO developed a formal transportation manual detailing the logistics involved in the transportation of Crane 38.  Accordingly, the terms of the Purchase Order were further supplemented by the work scope and inclusions per OXBO – Portsmouth Naval Shipyard REV VI dated February 24, 2021 (the "**REV VI Transport Manual**").  *Id.*

18.     Specifically, pages 350 and 351 of REV VI Transport Manual establish the general timeline for the sequence of events to relocate the crane from Manitowoc, Wisconsin to Portsmouth Naval Shipyard in Kittery, Maine.  A true and accurate copy of Pages 350 and 351 of REV VI Transport Manual are attached hereto as **Exhibit C**.

19.     As set forth in Purchase Order and the REV VI Transport Manual, OXBO anticipated that the Project would take approximately 50 days, working estimated 12-hour days every day of the week, beginning at sunrise.  *See* Exhibit B, pg. 2.

20.     The proposed 50-day schedule was as follows:

- **Days 1-8**: Preparation work at the Manitowoc, Wisconsin facility to get Crane 38 ready for transportation.

- **Days 9-15**: Loading Crane 38 into the barge.

- **Days 16-35**: Sailing the barge from Manitowoc, Wisconsin to Kittery, Maine.

4

- **Days 35-40**: Receipt of the barge in Maine and building the frame to receive Crane 38.

- **Days 41-42**: Offloading Crane 38, set to rails on maintenance spur.

- **Day 42-45**: Removing transport equipment and counterweights. KNES was responsible to install the counterweights.

- **Days 46-50**: Lay the boom stand down and remove transportation equipment.

21. The relevant dates of the actual 50-Day Schedule were as follows:

- **April 29, 2021 (Day 1)**: OXBO was on site to receive equipment necessary to commence its performance of the Project.

- **April 30, 2021 (Day 2)**: The proposed Turnover Date.

- **May 12, 2021 (Day 14)**: The actual Turnover Date.

- **June 18, 2021 (Day 50)**: The expected completion date.

- **June 28 (Day 60)**: The date Crane 38 was placed on the rails.

- **June 2, 2021 (Day 64)**: Barge moved from primary location to secondary location where remaining equipment would be removed

- **July 3-5 (Days 65-67)**: OXBO unable to work per Portsmouth Naval Base protocol.

- **July 12 (Day 74)**: The actual Project completion date.

22. The Purchase Order was supplemented by a revised scope of work documents, which was sent to Kurt Prange at KNES via email dated February 26, 2021 (the "**Scope of Work**"). A true and accurate copy of the February 26, 2021 email and Scope of Work is attached hereto as **Exhibit D**.

23. On March 10, 2021, OXBO accepted the Purchase Order, incorporating the REV VI Transport Manual and the Scope of Work (collectively, the "**Contract**").

24. The Purchase Order contemplated OXBO invoicing KNES: (i) 5% on the submittal of a draft transportation manual, crane install plan and delivery, storage, and handling documentation;

5

13349940.3

(ii) 45% upon arrival and securement and acceptance of the barge in Kittery, Maine; and (iii) 50% upon "final set at Portsmouth Naval Base and approved schedule for KNES tools/equipment return to Wisconsin facilities in Manitowoc and New Berlin Wisconsin." Exhibit B, pg. 2.

25.     The Purchase Order's payment terms are "Net 30 days upon receipt of invoice by KNES."  *Id.* at pg. 1.

26.     KNES was behind schedule during the course of the entire Project, which was the direct and proximate cause of a cumulative twenty-four (24) day delay to the schedule.

27.     The cumulative charges are the direct and proximate result of schedule delays that were not caused by OXBO.

28.     On or about June 29, 2021, near the conclusion of the Project, OXBO and KNES conducted a job closeout meeting via Zoom video conference that was attended by Greg Butts, Collin Ismay, and Kurt Prange of KNES and Andy Hulings, Justin Valley and Keith Settle of OXBO.

29.     During this meeting, KNES stated that OXBO did a great job of working with KNES to overcome the delays and changes on the project and that OXBO was not the cause of any delays throughout the duration of the project.

30.     Likewise, there is no documentation executed and agreed upon by both parties that OXBO caused any delays regarding the Project.

31.     At this juncture, OXBO began to attempt to negotiate payment for the delays not caused by OXBO.

32.     On December 3, 2021, after negotiations broke down, OXBO issued the final OXBO Invoice No. 21-2740 to KNES in the amount of $1,231,563.75 (the "**Delay Invoice**") for the charges arising out of the delays in the completion of the Project and other charges for services and rentals

13349940.3

incurred by OXBO and caused by KNES that were required to complete the Project. A copy of the Delay Invoice is attached hereto as **Exhibit E**.

33.     Despite numerous requests by OXBO, KNES has failed and refused to make payment for the delays it caused to the completion of the Project.

### FIRST CAUSE OF ACTION
### (Breach of Contract)

34.     OXBO incorporates by reference the allegations set forth in paragraphs 1 through 33 above as though fully set forth herein.

35.     OXBO and KNES entered into the Contract pursuant to which OXBO transported Crane 38 from Manitowoc, Wisconsin to Kittery, Maine for KNES. Pursuant to the Contract, KNES was required to pay OXBO for all charges, including charges related to delays not caused by OXBO.

36.     OXBO performed by transporting Crane 38 from Manitowoc, Wisconsin to Kittery, Maine. OXBO has invoiced KNES in accordance with the terms of the Contract. As of the date of the filing of this Complaint, KNES has failed to pay the full amounts owed to OXBO under the Contract.

37.     KNES is in breach of the Contract with OXBO and has failed to remedy its breach despite OXBO's repeated requests for payment.

38.     By reason of KNES's breach of the Contract, OXBO has suffered, and will continue to suffer, actual damages in an amount in excess of $75,000. The exact amount of such damages will be proven at trial.

### SECOND CAUSE OF ACTION
### (Unjust Enrichment/Quantum Meruit)

39.     OXBO incorporates by reference the allegations set forth in paragraphs 1 through 38 above as though fully set forth herein.

13349940.3

40.     OXBO has conferred a benefit on KNES by transporting Crane 38 from Manitowoc, Wisconsin to Kittery, Maine.  KNES has an appreciation or knowledge of the benefit it received and the expense to OXBO.

41.     KNES will be unjustly enriched if it is allowed to avoid paying OXBO.

42.     OXBO is therefore entitled to judgment against KNES in an amount in excess of $75,000 in order to cure any unjust enrichment.  The exact amount of such damages will be determined at trial.

### THIRD CAUSE OF ACTION
**(Contract Implied in Fact/Promissory Estoppel)**

43.     OXBO incorporates by reference the allegations set forth in paragraphs 1 through 42 above as though fully set forth herein.

44.     KNES requested that OXBO transport Crane 38 from Manitowoc, Wisconsin to Kittery, Maine and agreed to pay OXBO for, among other things, any delays associated to the transportation schedule that were not caused by OXBO. Reasonably relying upon KNES, OXBO moved Crane 38 pursuant to KNES's directions, including any delays and stand-bys according to KNES's requests, all in reasonable reliance on KNES's promises to pay for the services provided by OXBO, including but not limited to delays that were not caused by OXBO.

45.     KNES knew or should have known that OXBO would rely on KNES's promises.

46.     OXBO expected and reasonably relied upon KNES to pay for any delays not caused by OXBO.

47.     KNES knew or should have known that OXBO expected payment relating to any delays that OXBO did not cause.

48.     The charges associated with KNES's delays and other charges incurred in reliance on the promises of KNES, is an amount in excess of $75,000.  The exact amount of such damages will

8

be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, OXBO respectfully requests that the Court enter judgment in favor of

OXBO and against KNES on each of OXBO's causes of action as follows:

A.    For judgment in favor of OXBO and against KNES in the principal amount in excess of $75,000, the exact amount of which will be proven at trial;

B.    For judgment in favor of OXBO and against KNES for pre-judgment and post-judgment interest on all amounts due and owing to OXBO from KNES at the maximum rates allowable by law;

C.    For judgment in favor of OXBO and against KNES for costs and expenses incurred by OXBO in connection herewith, the exact amount of which will be proven at trial; and

D.    For judgment in favor of OXBO and against KNES for such other and further relief as the Court deems appropriate.

Respectfully submitted,

*/s/ Christopher B. Wick*, Trial Attorney
Christopher B. Wick (0073126)
Daniel A. DeMarco (0039820)
HAHN LOESER & PARKS LLP
200 Public Square, Ste. 2800
Cleveland, Ohio 44120
Telephone:  (216) 621-0150
Facsimile:  (216) 241-2824
cwick@hahnlaw.com
dademarco@hahnlaw.com

O Judson Scheaf, III (0040285)
HAHN LOESER & PARKS LLP
65 E. State St., Ste. 1400
Columbus, Ohio 43215
Telephone:  (614) 233-5190
Facsimile:  (614) 221-5909
jscheaf@hahnlaw.com

*Counsel for Plaintiff OXBO, Inc.*

9

## **JURY DEMAND**

Plaintiff hereby demands a jury trial by the maximum persons permitted by law on all issues triable to a jury.

*/s/ Christopher B. Wick*
Christopher B. Wick, Esq.

13349940.3

# **EXHIBIT A**



# Portsmouth Naval Shipyard 140 ton crane Project

## Submitted to
## Konecranes

## September 15th, 2020

## Submitted by

## OXBO Mega Transport Solutions
PO Box 1148
Scappoose, OR 97056
T: 503-543-6696

*"Partnering as a Strategic Alliance"*

September 15th, 2020

Kurt Prange Logistics & Export Supervisor
Konecranes Nuclear Equipment & Services (KNES)
11420 W. Theodore Trecker Way
West Allis, WI 53214

Re: Portsmouth Naval Shipyard 140 ton crane delivery

OXBO Mega Transport Solutions (OXBO) is pleased to present for your consideration, our proposal on the above referenced project. The following is an overview of OXBO and our qualifications to complete the scope of work specified on this project.

**OXBO Mega Transport Solutions**
OXBO was founded in 1993 and specializes in the lifting and moving of over-weight and over-dimensional equipment, machinery, ships, vessels, and commercial structures. In our 27 plus years of service, we have developed a loyal client base throughout the United States. We work with customers representing all commercial and industrial applications, and are sensitive to the individual needs of each type of customer including government agencies, small and large contractors, developers and private individuals.
Our staff consists of experienced industry professionals and we are committed to delivering you a team that will ensure optimal performance throughout the duration of your project. We excel in projects with greater degrees of technical difficulty and have the experience, knowledge and commitment to meet or exceed our client's expectations.
Our commitment to the quality of our work and the satisfaction of our customers has greatly contributed to the success of our company. As a result, a large percentage of our work comes from customer referrals and repeat customers.

*OXBO's Core Values:*
**Safety**
Safety is a core value at OXBO and requires an unwavering commitment from every employee. No matter the size or complexity of a project, we work together to identify risks and prevent injuries. OXBO offers continuous training and education to its employees to reinforce safety concepts and procedures, helping to promote our culture of safety.
**Integrity**
We have the highest ethical standards in the industry. We emphasize integrity in every aspect of our business, thereby earning and maintaining the trust and respect of clients, suppliers, colleagues and communities.
**Commitment**
We will constantly strengthen our position as an industry leader through our adaptability, integrity, innovation, knowledge and quality.
**Teamwork**
We partner with our clients to deliver quality projects on time and on budget in a reliable, efficient and collaborative manner. Our relationships between our employees, clients and the communities in which we work are critical to the continued success of our business.
**Ingenuity**
We participate in creative thinking, new ideas and on-going learning and development that strengthen our performance. We take pride in devising creative solutions for the most complex issues.

**OXBO's Relevant Projects and Experience**

OXBO has performed numerous projects for clients such as Boeing, Intel, Shell U.S., Phillips 66, Vigor Industrial, Lampson Crane, Bechtel, Greenberry Industrial, Crowley Maritime, Foss Maritime, and many other public and private entities.  The following is a brief description showcasing some of our most recent projects:

**Barge Load-Out of Port Crane Components**
Tacoma, Washington





**Client:**
Konecranes
Milwaukee, Wisconsin

**Project Description:**
OXBO was contracted to load and offload components of two port cranes that were destined for the naval bases in the northwest. Utilizing electronic steered Goldhofer platform trailers, OXBO successfully completed the project keeping the project on schedule.

**Reference:**
Kurt A. Prange
Konecranes Nuclear Equipment & Services
262-207-1845

**Harvest Barge Launch**
Portland, Oregon



**Client:**
Vigor Fab
Portland, Oregon

**Project Features:**
- 580 feet long, 86 feet wide, 96 feet high weighing 13,000 tons

**Project Description:**
OXBO was contracted to engineer and execute a load-out plan for this 13,000 ton vessel.  A combination of 168 axle lines of electronic steered Goldhofer platform trailers and (32) 300 ton skid beams were used to move the vessel approximately 1,000 feet onto a floating dry dock.  The entire move was completed in one 10-hour shift.

**Reference:**
Doug Tull
Logistics Manager
503-913-2146

**Barge Load-Out of Oil Rig Modules**
Vancouver, Washington





**Client:**
Hilcorp Energy Company
Houston, Texas

**Project Features:**

- 30 modules weighing a total of 5.4 million pounds
- Largest module was a drill rig (above right) measuring 80 feet long, 40 feet wide, 50 feet high and weighing 700,000 pounds

**Project Description:**
OXBO was contracted to load and lash all 30 modules of this drill rig in a four day window to meet the client's deadline for delivery to the North Slope in Prudhoe Bay, Alaska.

**Reference:**
Paul Mazzolini
Rig Supervisor
907-777-8369

**"Michelle Foss" Tugboat Launch**
Rainier, Oregon



**Client:**
Foss Maritime
Rainier, Oregon

**Project Features:**
- 130 feet long, 42 feet wide, 33 feet high weighing 790 tons

**Project Description:**
OXBO has completed more than 20 projects over the last five years for Foss Maritime involving moving, loading and launching tug boats, pilot boats and other vessels. OXBO worked directly with Foss naval architects and engineers in designing transport cradles, calculating load points and coordinating all moves. Above, OXBO moves the "Michelle Foss" onto a floating dry dock to be launched in the Columbia River. Due to extremely low water levels, a 120 foot long, 8 foot 6 inch tall, temporary road had to be constructed on the dry dock floor in order to launch the tug.

**Reference:**
Don Nugent
Site Manager
503-978-6751

**Witt Penn Bridge**
Vancouver, Washington





**Client:**
Vigor Works
Clackamas, Oregon

**Project Features:**
- 3 sections measuring 325 feet long, 36 feet wide, 32 feet high weighing 700 tons each

**Project Description:**
OXBO was contracted to load three identical bridge sections onto a single barge. To fit all three sections, OXBO loaded the center section 13 feet above the barge deck to allow the other two sections to fit under the center section.

**Reference:**
Doug Tull
Logistics Manager
503-913-2146

**Offshore Drilling Platform Move**
Vancouver, Washington



**Client:**
Greenberry Industrial | Crowley Maritime Corporation
Vancouver, Washington | Jacksonville, Florida

**Project Features:**
- 60 feet square, 126 feet high weighing 250 tons

**Project Description:**
This project was a collaborative effort with Greenberry Industrial and Crowley Maritime. OXBO was contracted to engineer and execute a barge load-out plan for transporting components of the "Kitchen Lights Unit 3" offshore drilling platform being constructed in the Cook Inlet near Kenai, Alaska. This platform was loaded on the barge in a vertical position and then lowered to the barge floor.

**Reference:**
Tom Howell | Crowley Maritime Corporation
Project Manager
360-608-1706

**Scope of work**

OXBO will provide complete turnkey service for the delivery of one (1) complete 140 ton single boom shipyard crane from Manitowoc, Wisconsin to Portsmouth Naval Shipyard in Kittery, Maine; while providing the required documents to satisfy the requests of all parties.

This includes, but is not limited to:

1. **Formal transport manual**
A. Loading and unloading locations and support arrangements
B. Final loading/unloading sequence and timeline
C. Final stowage plan
D. Final dunnage plan showing proposed blocking and sea-fastenings
E. Final stability calculations for intact stability during voyage reviewed by third party, under conditions of a "beam wind" as defined by the greater of the maximum wind by weather routing multiplied by a 1.21 wind gust factor, or, if no weather routing is specified, assuming a standard 86.8 knot wind.
F. Computer sea-keeping analysis to predict motion responses for the intended route and time of year. Analysis will include the inertial and gravity forces acting on the cargo center of gravity for the six degrees of freedom. i.e. roll, pitch, yaw, heave, surge and sway
G. Design forces of sea-fastenings (derived from the sea-keeping analysis plus an assumed "beam wind" as defined above
H. Cribbing/blocking pressures (based on sea-keeping analysis)
I. Analysis showing the maximum sustained sea state which the loaded vessel and cargo can withstand
J. A description of the method used to perform a check of sea-fastening at least once each day (24 hour period) while in transit

2. **Crane Loading, Unloading, and Transit Plan**
OXBO shall submit a plan detailing the logistics involved in the transportation of the new crane. The plan includes a detailed sequence of lifts and rigging drawings with details of rigging equipment and methods of attachment to the component for installation. All rigging gear shall comply with OSHA requirements and any local requirements. Actual location of center of gravity and location of points for completely assembled crane and for each major component shall be provided.

1. **Formal Transport Manual**
A. Loading/unloading locations and support arrangements
   - Konecranes facility: Please see 2012-110 pages 1-2 for loading process in Manitowoc, WI.
   - Portsmouth Naval Shipyard: Please see 2012-210 pages 1-3 for offloading process in Kittery, ME.
   - Final support arrangements for both locations will be provided on award of project when all dock information is given for full engineered report.

B. Loading/unloading sequence and timeline
   - Please see 2012-210 page 4 showing transition from dock to barge.
   - Please see 2012-300 page 1 for estimated CG transition when the boom is lowered to the shipping stand.
   - Final transition and ballasting plan to be completed on award of project.

C. Stowage plan
   - Please see 2012-300 pages 3-4 for anticipated stowage plan of crane, boom, and counterweights.
   - Final stowage plan to be completed on award of project.

D. Dunnage plan showing proposed blocking and sea-fastenings
   - Please see 2012-300 page 2 for possible dunnage configuration and truss capacity requirements.
   - Final engineered plan to be provided after award of project.

The following engineering will be completed if OXBO is awarded this project, and submitted for review of Konecrane and US Navy personnel:

Final stability calculations for intact stability during voyage reviewed by third party, under conditions of a "beam wind" as defined by the greater of the maximum wind by weather routing multiplied by a 1.21 wind gust factor, or, if no weather routing is specified, assuming a standard 86.8 knot wind.

Computer sea-keeping analysis to predict motion responses for the intended route and time of year. Analysis will include the inertial and gravity forces acting on the cargo center of gravity for the six degrees of freedom. i.e. roll, pitch, yaw, heave, surge and sway

Cribbing/blocking pressures (based on sea-keeping analysis)

Design forces of sea-fastenings (derived from the sea-keeping analysis plus an assumed "beam wind" as defined above

Analysis showing the maximum sustained sea state which the loaded vessel and cargo can withstand

A description of the method used to perform a check of sea-fastening at least once each day (24 hour period) while in transit

**Barge transit from Manitowoc, WI to Kittery, ME. - Anticipated duration: 20 days**
See the map below for the route that will be taken from Manitowoc, WI to Kittery, ME. The total miles traveled is 2,696 miles.



While in transit, daily updates will be provided on locations and anticipated arrival times. All securements will be monitored and tested daily to ensure they remain tight.

**Procedure and Order of Operations**
Below is an estimated general timeline for the sequence of events to relocate crane #36 from Manitowoc, WI to Portsmouth Naval Shipyard in Kittery, ME.

Day 1: Arrival to Manitowoc, WI facility. Begin to receive equipment. KNES to provide crane service within capacity of cranes onsite (Manitowoc 888) to assist with offloading. Prep to receive barge. Stage equipment onsite. OXBO to provide material and layout to stage counterweight carts at elevated height for counterweight offload and transport via SPMT (optional to set on stands or SPMT pending timing).

Days 2-3: Receive / Assemble equipment, receive barge (day 3). Begin to prep barge for loading of counterweights and remainder of barge deck prep. Finalize loading counterweights into carts.

Days 4-5: Load counterweights via SPMT to barge. Continue barge prep and loading additional items.

Days 6-7: Finish deck prep and loading of additional items, set boom stand (additional items and boom stand to be set to barge with crane supplied and operated by KNES). Begin install of transport equipment under crane, prep for loading.

Days 8: Load Crane, set into final transport location. Begin lashing requirements.

Days 9-13: KNES to position boom and set down onto boom stand. KNES to begin steps to lower A Frame in prep for transport.

Days 9-15: Finalize lowering of A Frame and related items. Finalize Sea Bracing and lashing.

Day 16: Release barge for Tow towards Kittery. OXBO to clean up and demobilize from Manitowoc.

Days 16-35: The barge sails from Manitowoc, WI to Kittery, ME.

Days 33-35: Mobilize to Kittery, complete badging. Prep to receive barge.

Days 35-40: OXBO will receive barge at Portsmouth Naval Shipyard. KNES and OXBO to reset A Frame into operating position and related items (OXBO to provide crane and man lift). Remove lashing and sea bracing. Set up for offload.

Days 41-42: Offload crane, set to rails on maintenance spur.

Days 42-45: Remove transport equipment from main crane. Offload counterweights via SPMT. Counterweights to be picked from SPMT by Portal Crane #36 to assist with proposed acceptable ground loadings. KNES to install counterweights.

Days 46-50: The boom stand will be laid down and roughly secured for transit on the barge. OXBO equipment as feasible will be loaded to the barge for demob. The barge will be relocated to a secondary facility where the equipment will be removed, and the deck will be cleaned for release.

**Equipment Involved**

OXBO will provide all equipment to complete our scope of work, and successfully deliver the crane to Portsmouth Naval Shipyard. That includes:

- Goldhofer electronic steer platform trailers to maneuver the cranes from dockside on to, and off of the barge.
- Support beams to lift and support the crane from the second tier equalizers.
- Barge ramps and transitions to accommodate for height variables between the barge and dock.
- Various forklifts and other equipment needed to position and move gear around on shore.
- All lashing and securement materials to safely stow the crane during transport.

Additional scope due to added bracing and ground pressure changes.

Portal Sea Bracing:

This lower section of the sea bracing was included in our original proposal. The drawings included in the proposal indicated A welded gusset connection to the portal structure. The gusset was suggested to align with internal stiffening. Attached to the gusset was intended to be lateral pipe struts to the barge deck as required.

Through several levels of communication, it was determined that KNES would not allow a welded connection to the portal structure to support the proposed lashing method. It was suggested to connect by using some of the lifting lugs and/or similar areas. After looking into the forces proposed during transport it was determined that those lugs would not support a solid bracing layout. Upon further communication it was determined that the lifting points for the portal structure itself would be the best avenue to pursue. The KNES and OXBO teams worked together to design a connection that would allow attachment of the lateral pipe struts and avoid welding to the portal. This connection method and location requires fabrication of additional brackets which falls outside OXBOs original proposal.

Upper Sea Bracing:

This section of sea bracing was not included in our original proposal. The drawings included in the proposal indicated "It is recommended the slewing shear stops be designed / installed prior to barge shipment to reduce slewing forces experienced by crane and tower". OXBO identified the forces proposed to this structure during transport and communicated the details of concern. The OXBO and KNES teams verified the slewing structure could not manage the proposed forces and the machinery house would need to be additionally braced.

A similar situation to the portal bracing, this requires fabrication of brackets to eliminate welding to the crane itself. The brackets will allow a pin connection for the lateral pipe struts. In addition, this bracing will require brackets and fabrication for the connection to the barge deck. Below are key items necessary to complete this scope of work.

- Fabrication of upper brackets.
- Fabrication of barge connection brackets.
- X4 pipe struts with pin connection
- Additional welding
- Modification to barge to allow proper connection of lower brackets.
- Removal and repair to barge upon completion.

Ground Pressure Restrictions:

Early in the planning phase of this project the question of acceptable ground pressure was asked by OXBO. With little to no feedback on this subject OXBO proceeded with what is considered commonly acceptable with this kind of work. The initial pressure was shared with KNES of 1.12ksf. As things developed in the transport arrangement the pressure was adjusted to 1.16ksf.

As the site identified the location for offload and investigated the process more in-depth, it was determined that there would be restrictions. OXBO was informed just prior to the site visit that the first 18' from the water edge would be restricted to 600psf. No exceptions. The remaining area where the rotation takes place would be considered HS-25. Following the site visit, OXBO was informed that the remaining area (previously HS-25) would now be restricted to 600psf as well. With the newest information our teams began to work towards location C for offload, as there may be less restrictions and conflicts.

In Location C, OXBO was informed the first 18' was still to be restricted to 600psf. We would have to clear span from the barge to the first rail foundation in order to avoid loading the face of the pier. The remaining area is still under review for the 1.16ksf and the final restrictions are TBD.

Based on the requirements to clear span the first 18', our original offload plan would no longer work. With this requirement we will have to utilize a ramping system capable of the reach, including (9) 30' ramps. The below cost includes the span for the first 18' only, pending final review there may be additional requirements.

| | |
|---|---|
| **Project Cost** | **$3,262,715** |
| **Additional Scope** | **$260,000** |
| **Total Lump Sum:** | **$3,522,715** |

Please note that Charter Insurance is not included in the above price. It is estimated at $125,000-140,000 based on an initial valuation of $50 million USD.

In the event that a delay is caused or standby is requested by Konecrane, beyond the control of OXBO or its subsidiaries, a daily rate is charged at: Days 1-6: $34,970   Days 7-13: $45,170   Day 14+: $55,340

We appreciate the opportunity to provide this proposal for consideration to relocate the new 140 Ton Crane to the Portsmouth Naval Shipyard. If you have any questions or comments, please contact me at 503-543-6696 or by e-mail at Justin@oxboinc.com

Sincerely,

Justin Valley

**OXBO Mega Transport Solutions**
Northwest Sales Manager

# **<u>EXHIBIT B</u>**

# Change to Purchase order



**KONECRANES®**
**Lifting Businesses™**

Page 1 of 6

| Supplier Address | Information | |
|---|---|---|
| Oxbo Inc<br>33341 Gilmore Rd<br>Scappoose OR 97056-2537<br>USA | Purchase Order Number | 4502501475 |
| | Order Date | 12/09/2020 |
| | Contact Person | Kurt Prange |
| | Phone | 262-207-1845 |
| | Fax | 262-364-5701 |
| | Email | kurt.prange@konecranes.com |
| Supplier number 1808463 | **Delivery Details** | |
| **Billing Address** | Terms of Payment | 30 days net |
| Konecranes Nuclear Equipment & Services, LLC | Currency | USD |
| invoices.konecranesnuclear@konecranes.com | Incoterms ® 2010 | EXW NEW BERLIN WI |

**Delivery Address**

Konecranes Nuclear
Equipment & Services LLC
5300 S. Emmer Drive
New Berlin WI 53151-7365
USA

**Transportation**

Payment is Net 30 days upon receipt of invoice by KNES
--5% on submittal of transport manual, crane install plan, delivery,
storage and handling documentation.

| Item | Material Description | Quantity | UM | Unit price | Value | Delivery |
|---|---|---|---|---|---|---|
| 10 | **Crane Transport and Documentation** | 1 | PC | 3,522,715.00 /PC | 3,522,715.00 | 02/26/2021 |

\*\*\* Net price changed \*\*\*
\*\*\* Delivery date changed \*\*\*
\*\*\* Text changed \*\*\*
Network                           4081259 / 4012
Terms of this Purchase Order for Project US52-00276 will be per work
scope and inclusions per OXBO -Portsmouth Naval Shipyard REV VI Dated
February 24, 2021 and revised scope of work per Andy Hulings 2/26/2021
email.
OXBO's scope provided for clarity purposes for both OXBO and KNES to
review due to extended evaluations, reviews, planning and conferencing
between OXBO and KNES. But does not limit or eliminate previous RFQ
details and information provided.
In addition, OXBO's Transport Manual, dated 02-March-2021--drawings,
data and content shall be included as approved documentation per
contract and RFQ once accepted by Navy.

Any delays caused by OXBO after the turnover date will be documented by



Mar 10, 2021 21:40:02

## Change to Purchase order



KONECRANES®
Lifting Businesses™

Page 2 of 6

| Document Information | | | |
|---|---|---|---|
| Purchase Order Number | 4502501475 | Order Date | 12/09/2020 |

both parties and time added to back end. Any delays caused by OXBO that
"trip" KNES I.D's with KNES customer will be charged back to OXBO or
purchase order reduced for
the LD amount of $9,975 per calendar day of delay, up to but not
exceeding 5% of OXBO's total contract price.
If the turnover date of 04-30-2021 or OXBO's
proposed delivery date is delayed by KNES or KNES customer for any
reason beyond the control of OXBO, KNES agrees
to pay OXBO $34,970/day (Days 1-6),
$45,170/day (Days 7-13), $55,340/day (Days 14+).
Delay days and credit days are cumulative throughout the
duration of the project for both OXBO and KNES respectively.
KNES is committed to transparency in an effort to control costs while
building a strong relationship.
Weather delays during tow will be billed to KNES at $11,040.00/day only
for the number of days required directly associated with weather. The
$11,040 per day weather delay charge will not be considered unless a
weather delay causes the end date of 6/7/2021 to be exceeded. Price
does not include any Port Fees, Dockage or Wharfage Terminal
labor/stevedoring, if appliable. Neither KNES or OXBO shall be liable
to the other for any I.D's caused by the weather delays.

--5% on submittal of draft transport manual, crane install plan and
delivery, storage, and handling documentation. Transport Manual to
include all tidal information for loading and off-loading purposes so it
can be reviewed and understood for effective and efficient delivery of
product to meet timeline.
--45% on arrival and securement and acceptance of barge at Kittery, ME.
--50% final set at Portsmouth Naval Base and approved schedule for KNES
tools/equipment return to Wisconsin facilities in Manitowoc and New
Berlin Wisconsin.
OXBO is responsible to return KNES tools and equipment as communicated
throughout RFQ process:
Boom Stand sections - Total 9
X1 Bottom, X7 Mids, X1 Top
X4 Portal Brackets
X1 Front brace tie beam
X1 Rear brace tie beam
X4 Barge brace deck lugs
54484505 -- Dual Spool Stand
5448B114 -- Bottom Block and Stand
54485012 -- Single Spool Stand
54475081 -- Counterweight Stands Qty of (2)
Two upper cylinder 600lbs each
One upper frame cylinder mount 15,000lbs
Two lower cylinders 3,500lbs each
Two lower mounting beam supports 4,000lbs each
Two lower mounting beams 9,000lbs each
HPU 4,000lbs on drawing
One pivot beam 20,000lbs
One permanent cross beam 9,000lbs
Two upper frame tie beams 950lbs each
20ft Container
(Per Each Phase) to be paid as work completed is verified both by KNES
and OXBO.
--Each invoice to be emailed directly to Kurt Prange in PDF.
--No additional changes or charges will apply unless mutually agreed to
by OXBO and KNES.
OXBO understands requirements for this transport, including limited
ground pressure and working area. OXBO includes ramping over the 600psf
restricted area between the water edge and the first rail foundation



Mar 10, 2021 21:40:02

## Change to Purchase order



| Document Information | | | |
|---|---|---|---|
| Purchase Order Number | 4502501475 | Order Date | 12/09/2020 |

(water side) ONLY. Remaining area is expected to withstand the proposed 1.16ksf "static" shadow pressure and potential 1.76ksf dynamic shadow pressure influenced by the transport system.

Portal Brackets X4, Front Brace tie beam X1, Rear Brace tie beam X1 and Barge Brace deck lugs X4 become property of KNES with delivery included.

--OXBO agrees to follow site specific rules at KNES Manitowoc Facilities and Portsmouth's Naval Shipyards including, inspections, badging and protocols including Covid 19.
--Date on PO are "Ranges" in which the activities will take place.
Sequencing may change as long as it does not impede processes or activities delaying the timeline of transport to site.
Firm dates for loading, arrival and off-loading to be determined and communicated to all parties.
Date(s) of arrival at Portsmouth Naval Shipyard site to be between 5/31-6/2.
Date(s) of transport complete with Crane placed on rail between 6/6-6/7.

The turnover date is April 30, 2021. Turnover date is defined as date OXBO can physically handle crane not arrival date of equipment and supplies.
OXBO is responsible for all costs during the transportation of Project US52-00276 throughout the Manitowoc loading, Kittery off-loading, barge cleaning and return of KNES tools to Wisconsin facilities in Manitowoc and New Berlin Wisconsin.
Any additional tools or equipment required for transport will be the responsibility of OXBO including availability and cost as provided in original RFQ's and revised scope of work.

PO based on pricing submitted for Kittery Berth 2 Off-Load Location C as identified in approved Transport Manual "PDF OffloadSite--Working Area Edit (REV1)". The document will be included in this purchase order to identify the area required at arrival, the area required for actual offload clearance area, the area required to breakdown the transports and beams at spur and the area required for KNES testing. OXBO's Transportation Manual must meet approved ground pressures identified and accepted by Navy.
The approved Transport Manual will allow OXBO to clear span the 600psf restricted area from the water edge to the first rail foundation (water side) (approx 18ft). Remaining area is expected to withstand the 1.16ksf " static" shadow pressure and potential 1.76ksf dynamic shadow pressure influenced by the transport system.

--A Certificate of Insurance is required from OXBO at time of PO acceptance. PO acknowledgement is required within 48 hours of transmittal from KNES to OXBO.

--Kurt Prange is the Prime KNES contact for this Purchase Order
--Submittals required per RFQ -- Contract NO. Spec 140t N6247018R2003
Attach A
1) SD-12 TRANSPORTATION MANUAL: Berth 2 Location C
2) SD- 8.2 CRANE INSTALL PLAN
3) SD-8.3 Accident Prevention Plan
4) 1.6 DELIVERY, STORAGE AND HANDLING
5) 1.5.6 Pre-Install Conference at installation Site and two additional visits if required

Because KNES is not seeking a charter agreement with Ceres, OXBO shall provide a Charter Agreement directly with Ceres and will provide the



Mar 10. 2021 21:40:02

# Change to Purchase order



## Document Information

| Purchase Order Number | 4502501475 | Order Date | | 12/09/2020 |
|---|---|---|---|---|

Charterer's Liability Insurance Information to KNES.

KNES and OXBO will jointly pursue the procurement
of ocean marine cargo insurance to cover the cargo
while in transit from Origin to Destination. Policy limit
shall be equal to cargo value of $55M. If OXBO procures
coverage, a line item on the purchase order will be initiated from KNES
to OXBO for payment of the policy amount at cost
plus 0% with a Net 30 term.

A complete (SIR) Supplier Inspection report following AISC D1.1
standards to be provided for Sea Bracing bracket
fabrication including Portal brackets, Front brace tie beam, rear brace
tie beam and barge brace deck lugs.
OXBO providing $2,000,000 USD cargo insurance while the Crane is on land
and being loaded.
KNES acknowledges that upon request, higher policy limits are available
at an additional cost. KNES agrees
to hold OXBO harmless and free from any claim of damage, loss or any
liability of any kind or nature for which OXBO is not insured.

Offload Site-Work Area_ Edit (REV1) included

**Total net value excl. Tax**                                    **3,522,715.00 USD**

PLEASE INDICATE OUR PURCHASE ORDER NUMBER IN EVERY DOCUMENT CONCERNING THIS ORDER.

Please send us an order acknowledgement within 48 hours.

The purchaser's General Terms and Conditions of Purchase 2018 are incorporated into and made part of this
contract/purchase order. Inconsistent or additional terms presented by supplier are void unless expressly accepted in
writing and signed by the purchaser and supplier.

Please mention the country of origin of each product on the invoice.

A complete (SIR) Supplier Inspection report is required for all machined or fabricated components with traceability to
the manufacturing lot and Purchase Order. The SIR must be maintained by the supplier and available upon request
by KNES.

Kurt A. Prange
Export Logistics Supervisor

Christina Settle
Chief Risk & Financial Officer        03-10-2021

Konecranes Nuclear Equipment & Services, 16545 W. Beloit Road , New Berlin WI 53151-7365, USA
Business ID:                www.konecranes.com

# Change to Purchase order



General Terms and Conditions of Purchase 2016

**1. APPLICABILITY**
These general terms and conditions of purchase ("Terms and Conditions") shall apply exclusively for any and all purchase of Products and/or Services by the purchasing company ("Purchaser") identified on the purchase order form and/or written purchase agreement with supplier ("Supplier") unless otherwise agreed in writing between Purchaser and Supplier ("Parties"). All purchases of Products and/or Services by Purchaser shall be governed only by these Terms and Conditions and the Purchaser hereby objects any terms and conditions in any quote, proposal, order acknowledgement or any other form issued by Supplier. These Terms and Conditions shall supersede and exclude any other terms and conditions of sale or purchase even if the Purchaser has not explicitly excluded them. Modifications and amendments to these Terms and Conditions or the Purchase Agreement shall be valid only if the Parties agreed in writing.

**2. DEFINITIONS**
"Products" shall include any products, material, components, equipment, spare parts, documentation and services such as installation and testing of the Products, which are necessary for operation or the intended use of the Products. The Products shall include the software necessary for operation of the Products and embedded in and delivered as part of the Products.
"Services" shall include all work, services and other necessary works, components, materials and spare parts, even if they are not expressly included in the specifications or other documentation relating to the Services.
"Delivery" shall mean the completion and delivery of the Products and/or performance of the Services in accordance with the Purchase Agreement. Delivery shall include all necessary documentation, including but not limited to technical documentation, reports, instructions and manuals enabling the use, installation, operation, maintenance and repair of the Products or created, required or developed by Supplier or any party in connection with the Products and the Services.
"End-User" is the customer of Purchaser purchasing the end product of which the Product and/or the Services form a part.
"Purchase Agreement" means these Terms and Conditions along with the corresponding written purchase agreement and/or purchase order.
"Supplier Policies" means Supplier's Global Supplier Manual, Environmental Policy and Konecranes' Supplier Code of Conduct.

**3. COMPLIANCE WITH LAWS, REGULATIONS AND KONECRANES' SUPPLIER CODE OF CONDUCT**
Supplier shall at times and at its own cost ensure that the Products including but not limited to their design, manufacture, and documentation, and the performance of the Services fully comply with all applicable laws and regulations including but not limited to the requirements of any safety and environmental laws, regulations and standards. The Products shall include all safety devices and instructions required by law or the specifications and shall meet or exceed industry best practices. Supplier agrees to strictly comply with the Supplier Policies and Purchaser shall have the right to audit the compliance of Supplier's compliance with Supplier Policies and such right shall survive Delivery and/or termination of the Purchase Agreement.

**4. CHANGES**
The Products and the Services will be part of end products for which operational safety is an absolute requirement. Supplier has no right to make or undertake any changes in the Products, specifications, raw materials, quality of raw materials, place of manufacturing, agreed manufacturing processes, design and dimensions of the Products including tolerances or any other comparable changes that may affect the safety, operation, quality of the Products and/or Services, the delivery time agreed in the Purchase Agreement ("Delivery Time") or the correct fulfilment of the Purchase Agreement without Purchaser's prior written consent.

**5. INSPECTIONS AND QUALITY CONTROL**
Supplier shall be responsible for the quality of the Products and/or Services and carrying out the necessary inspections and tests at its own cost and deliver inspection and test reports and certificates at Purchaser's demand. Purchaser shall be allowed free access to the facilities of Supplier at reasonable times for the purpose of inspecting or testing the Products, manufacturing processes and the quality. Any acceptance of inspections or testing of the Products, Supplier's technical documents or drawings, or supervision of design work or manufacturing by Purchaser or End User, shall not to any extent release the Supplier from any of its obligations or limit Purchaser's right to make claims relating to the Products or Services.

**6. PACKING, MARKING AND STORAGE**
The Products shall be packed appropriately with regard to the nature and means of transportation and in accordance with any instructions of Purchaser as to the manner, size, weight or other aspects of the packing. Supplier shall clearly mark the Products with identity of the recipient, place of destination and any specific instructions necessary for handling and storage.

**7. DELIVERY**
Unless otherwise agreed in writing, the delivery terms shall be DDP (Incoterms 2010) the place of ordering unit of Purchaser. The place of performance of the Services shall be agreed in the Purchase Agreement. The Products shall be delivered to the Purchaser and/or Services shall be performed in accordance with the Delivery Time. No Products shall be delivered or Services shall be performed prior to the Delivery Time. Title to the Products shall pass to the Purchaser upon Delivery.

**8. DELAY BY THE SUPPLIER**
Time is of the essence with respect of the performance of Supplier's obligations under the Purchase Agreement and delivery of the Products and/or performance of the Services within the Delivery Time is a material obligation of Supplier. In case Supplier anticipates delay, it shall immediately notify Purchaser in writing, identifying both the cause and estimated duration of the delay. This does not limit Supplier's liabilities resulting from late delivery.
In case the Delivery Time is exceeded for any reason other than Force Majeure (as such term is defined in Article 16 below), or for a reason solely attributable to Purchaser, Purchaser shall be entitled to compensation as liquidated damages. Unless otherwise agreed in the Purchase Agreement, the amount of liquidated damages shall be one per cent (1 %) of the purchase price for the Products and/or Services for each day beginning the first calendar day on which Delivery Time is exceeded, up to the maximum of fifteen per cent (15 %) of the Purchase Price. The Parties acknowledge that (i) the amount of loss or damages caused by Supplier's delay is impossible or difficult to precisely estimate, and (ii) the amounts specified are a reasonable estimate of loss or damages and not a penalty. In order to claim liquidated damages, it is not necessary for Purchaser to prove that actual damage resulted from the delay. The Purchaser is further entitled to all other damages and remedies permitted by law as result of Supplier's breach of the Purchase Agreement.

**9. PRICES, PAYMENT TERMS AND RIGHT TO WITHHOLD**
The total price payable for the Products and/or Services shall be specified in the Purchase Agreement. The purchase price shall include all applicable taxes and duties, bank charges as well as all other expenses Supplier may incur through its performance of the Purchase Agreement, including but not limited to packing, handling, marking, storage, product testing and other similar costs. Any adjustment to the purchase price shall be agreed by Purchaser separately in writing. The date of invoice shall not be earlier than the date of Delivery. Purchaser is entitled to withhold payment to the extent the Delivery is not completed in accordance with the requirements of the Purchase Agreement.

**10. ACCEPTANCE OF THE DELIVERY**
After Delivery to Purchaser or End User and successful completion of inspections and tests, Purchaser will give acceptance for the Delivery provided that the Delivery meets the specifications and requirements of the Purchase Agreement, and provided Purchaser or End User has received all agreed documentation. Acceptance of the Delivery shall not to any extent release Supplier from any of its obligations and shall not limit Purchaser's right to compensation for non-conforming Products and/or the Services or any other remedies relating to the Purchase Agreement.

**11. WARRANTY**
Supplier hereby warrants that throughout the Warranty Period the Products and Services shall strictly comply with and meet the specifications, instructions, drawings, testing and all quality and technical requirements for the Products and Services as well as any environmental requirements set forth in the Purchase Agreement, samples and descriptions, as well as applicable laws, regulations and industry standards and shall be free from any defect in materials, workmanship or design and fit for their ordinary and intended purpose. Supplier further warrants that the Services shall be performed in a workmanlike manner, with the accurate and professional diligence, and in compliance with the best current practices in the industry and highest engineering or other applicable professional standards.
The Warranty Period shall be 24 months from acceptance by End User or 36 months from acceptance by Purchaser, whichever is earlier ("Warranty Period"). The Warranty Period shall be renewed for repaired or replaced Products or re-performed Services starting from the date when the repair, replacement or re-performance was approved by the Purchaser or the End User.
Any defective or otherwise non-conforming Products or Services shall at the sole discretion of Purchaser be repaired, replaced, re-performed or refunded by Supplier without delay and without any cost to Purchaser or End User including but not limited to inspection, installation, dismantling, and labour and transportation costs. Should Supplier refuse or fail to fulfil its warranty obligation to Purchaser's satisfaction within a reasonable period of time, Purchaser shall be entitled to have repair, replacement or re-performance carried out at Supplier's expense. The same right shall accrue to Purchaser, if in case of urgency and in order to mitigate costs Purchaser reasonably finds it inappropriate to wait for Supplier to carry out the work. This warranty obligation of Supplier does not limit Supplier's liability and any rights to damages of Purchaser.

**12. AVAILABILITY OF THE PRODUCTS AND SPARE PARTS**
Supplier warrants the availability of the Products as spare parts under commercially reasonable terms for a period of ten (10) years after the Delivery of the Products.

**13. INTELLECTUAL PROPERTY RIGHTS**
All data, documentation, specifications drawings and technical documents, as well as other information delivered or paid for by P
urchaser shall remain the exclusive intellectual property of Purchaser and shall not be used by Supplier for any other purposes than for the performance of the Purchase Agreement. In case no separate software license has been agreed by the Parties, Supplier hereby grants to Purchaser, and/or to any third party designated by Purchaser a worldwide, royalty-free, irrevocable, perpetual, non-exclusive, transferable and sub-licensable license to use, distribute, reproduce and copy, adapt, develop and modify any software included in the Products and/or Services in any media without limitations. Supplier is responsible for procuring licenses at its sole cost to any third party software or other intellectual property included in the Product and/or Service in accordance with the foregoing. Supplier grants to the Purchaser an unlimited, worldwide, royalty-free, irrevocable, perpetual, non-exclusive and sub-licensable license to use, reproduce, modify and incorporate Supplier's materials such as manuals, instructions, drawings, text, visual designs and displays into Purchaser's materials. Supplier represents and warrants that all Products and Services and any improvements thereto will not contain any trojan horses, trap doors, back doors, malware, spyware, worms, or other similar computer programming virus (collectively, "Computer Viruses"). Supplier shall not have the right to use to any of the Purchaser's trademarks. Supplier warrants that the Products do not infringe any patents, trademarks, copyrights, design rights or any other intellectual property rights of third parties. In case of infringement Supplier shall, at Purchaser's discretion, indemnify, defend and hold harmless Purchaser for all consequences of Computer Viruses or any infringement on patent rights, trademarks, designs or other intellectual property rights caused by the manufacture, processing, use or sale of the Products and/or secure non-infringing Products. The obligation to indemnify, defend and hold harmless shall survive the termination of the Purchase Agreement.

# Change to Purchase order



**14. INDEMNIFICATION AND LIMITATION OF LIABILITY**
As Purchaser's international operations demand promptness and reliability, Supplier appreciates and accepts that Supplier shall fulfil all of its obligations with particular care, and even a minor breach may cause considerable damage to Purchaser and End User. Any damages and costs incurred by Purchaser or End User due to any breach by Supplier or its subcontractor shall be compensated for in full by Supplier. The Supplier shall defend, indemnify and hold the Purchaser harmless against losses and claims for injuries or damage to any person or property which is related to, arises out of or is in connection with performance of the Purchase Agreement by the Supplier or its subcontractor (and against all claims, demands, proceedings, damages, costs, charges and expenses in respect thereof or in relation thereto). The obligation to indemnify, defend and hold harmless shall survive the termination of the Purchase Agreement. NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT DAMAGES OR LOSSES UNLESS SUCH DAMAGE IS CAUSED BY GROSS NEGLIGENCE, WILFUL MISCONDUCT, BREACH BY THE SUPPLIER OF THE INTELLECTUAL PROPERTY RIGHTS (ARTICLE 13) OR CONFIDENTIALITY (ARTICLE 18), OR CLAIMS ARISING UNDER THE SUPPLIER'S INDEMNIFICATION OBLIGATIONS IN THIS ARTICLE. IT IS EXPLICITLY AGREED THAT ANY LIMITATION OF LIABILITY IS NOT APPLICABLE TO DAMAGE OR LOSSES ARISING OUT OF DEATH OR PERSONAL INJURY. Damages incurred by the End User shall not be considered as indirect damages. IN NO EVENT SHALL PURCHASER'S LIABILITY TO SUPPLIER UNDER THE PURCHASE AGREEMENT FOR ANY DAMAGES OR OTHER AMOUNT WHATSOEVER EXCEED THE PRICE FOR PRODUCTS AND/OR SERVICES REFERENCED IN THE PURCHASE AGREEMENT.

**15. INSURANCE**
Supplier shall maintain at its own expense general liability insurance (including product liability or completed operations) in a sum no less than USD 2,000,000 for each occurrence or accident. Upon demand, Supplier shall submit certificates of the insurances to Purchaser. The obligation to maintain insurances shall not affect or limit Supplier's and its subcontractors' liability.

**16. FORCE MAJEURE**
Neither party shall be liable to the other for delay or non-performance when caused by an event of Force Majeure. "Force Majeure" shall mean unforeseen events, which occur after entering into the Purchase Agreement and which are beyond the reasonable control of the Party affected by the events including but not limited to war, acts of government and, natural disasters, insofar as such an event prevents or delays the affected Party from fulfilling its obligations and such Party is not able to prevent or remove the Force Majeure without unreasonable expense. The Party claiming Force Majeure shall prove the effect on its performance, and immediately take reasonable measures to mitigate the consequences and inform the other Party in writing of the commencement time, expected duration and the end of the Force Majeure. If the Party's performance is delayed more than three (3) months as a result of a Force Majeure, either Party may terminate the Purchase Agreement by sending written notice to the other Party.

**17. EXPORT CONTROL**
Supplier shall strictly comply with all export control and economic sanction laws, trade embargoes and regulations of European Union and United States and us as well as all other applicable foreign control and economic sanctions laws and regulations (collectively "Economic Sanctions Laws"). Supplier represents and warrants that Supplier and each of its directors, officers, affiliates and subsidiaries: (i) is and shall remain in compliance with all "Economic Sanctions Laws" against designated countries, entities and persons (collectively, "Embargoed Targets") and (ii) is not an Embargoed Target or otherwise subject to any Economic Sanctions Laws. Without limiting the generality of the foregoing, Supplier shall not (a) directly or indirectly export, re-export, tranship or otherwise deliver any products and/or services to an Embargoed Target, or (b) broker, finance or otherwise facilitate any transaction in violation of any Economic Sanctions Law. Supplier shall advise Purchaser in writing within two weeks of receipt of the order - and in case of any changes without undue delay - of any information and data require to comply with said regulations. Supplier shall hold harmless, defend and indemnify Purchaser and be liable for any expenses and/or damages incurred by Purchaser due to any breach of the obligations according to this Article.

**18. CONFIDENTIALITY**
Supplier and its subcontractors shall keep confidential and shall not disclose to any third parties or use for any other purposes than those defined in the Purchase Agreement any confidential Information of Purchaser and its affiliated companies, including but not limited to technical, commercial, business related, financial or company information, or the existence and contents of the Purchase Agreement ("Confidential Information"). Supplier shall not use or refer to Purchaser's name for any purpose in any public or private releases. Supplier shall limit access to Confidential Information to those of its own personnel and subcontractors for whom such access is necessary for the proper performance of the Purchase Agreement, provided they are bound by written confidentiality obligations not less restrictive than herein. Supplier shall, upon the termination of the Purchase Agreement or at Purchaser's request and discretion, immediately return all Confidential Information (including copies) to Purchaser or destroy all Confidential Information and provide a certification of such destruction. The obligation of confidentiality shall survive the termination of the Purchase Agreement.

**19. TERMINATION**
Purchaser has a right to immediately terminate the Purchase Agreement or any part of it and without any liability towards Supplier in the event that a) Supplier is in material breach of its obligations under the Purchase Agreement and has failed to remedy such breach within thirty (30) calendar days of a written notice by Purchaser; Supplier's material breach includes the Delivery failing to meet the specified quality and/or safety requirements; or b) any proceeding of bankruptcy, liquidation, receivership or insolvency shall be commenced by or against Supplier or its property or Supplier makes assignment for the benefit of its creditors, or (c) it becomes otherwise clear that Supplier as a result of its financial or other difficulties is unable to fulfil its obligations in accordance with the Purchase Agreement.
Purchaser reserves the right to terminate with immediate effect all or any part of the Purchase Agreement at its convenience by notice in writing. In such case Supplier shall immediately stop the work referenced in Purchaser's notice and protect any work completed as of such date and Supplier is entitled to a reasonable termination charge consisting only of the actual direct costs associated with the Products and/or Services already produced/performed as of the date of the termination. Upon termination for any reason, Supplier shall immediately return all specifications, drawings and technical documents, material and tooling and any other Purchaser's property.

**20. ASSIGNMENT AND SUBCONTRACTING**
Supplier may not transfer, assign or subcontract the Purchase Agreement or any part of its obligations without prior written consent of Purchaser. Supplier shall be liable for the work of its subcontractors as it is for its own.

**21. APPLICABLE LAW AND DISPUTES**
The Purchase Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, including Article 2 of the Uniform Commercial Code as codified in Ohio Revised Code Chapter 1302, notwithstanding conflicts of law principles. Any controversy arising out of or related to the Purchase Agreement shall be construed and governed by the laws of the State of Ohio, including Article 2 of the Uniform Commercial Code as codified in Ohio Revised Code Chapter 1302, notwithstanding conflicts of law principles. Any action arising from or related to the Purchase Agreement shall be instituted and litigated in any state court located in Clark County, Ohio, or in any federal court with jurisdiction over Clark County, Ohio. Seller and Buyer hereby irrevocably consent to the jurisdiction of the courts of Clark County, Ohio. The rights and obligations of Seller and Purchaser will not be governed by the provisions of the 1980 United Nations Convention on Contracts for the International Sale of Goods; rather these rights and obligations will be governed by the laws of the State of Ohio.

*KP*
*CS*

Mar 10, 2021 21:40:02



To be Removed by Government:
- Remove Cleat
- Remove Timber along berth edge
- Remove retaining wall as required
- Grade area to roughly 1% between rail elevation of 9.8 and duct elevation of 10.1 to 10.5.
Note: Expected timeframe contractor will need access to slab area 5/01 – 5/25

132'-9 1/2" [132'-9 1/2"]

No laydown space within 10' of DD1 complex and support equipment. Govt to approve deviation if contractor requires access to support offload of crane commissioning.

APPROX. LOCATION OF 20' FIRE LANE

182'-3" [182'-3"]

213'-6 1/2" [213'-6 1/2"]

NEED TO MAINTAIN THE ABILITY TO GET A TRUCK THROUGH THIS PATH.

49'-0 1/2" [49'-0 3/4"]

# EXHIBIT C

## 5.0 Crane Removal / Installation Plan
(SD-08.2)
### 5.1 Crane Install and Transport
Refer to (Section 4)
### 5.2 General Timeline
**Portsmouth Naval Shipyard Crane #38 – 140T Portal Crane – General Timeline**
Below is an estimated general timeline for the sequence of events to relocate crane #36 from Manitowoc, WI to Portsmouth Naval Shipyard in Kittery, ME.

**Day 1:** OXBO to provide material and layout to stage counterweight carts at elevated height for counterweight offload and transport via SPMT (optional to set on stands or SPMT pending timing).

**Day 1:** Arrival to Manitowoc, WI facility. Begin to receive equipment. KNES to provide crane service within capacity of cranes onsite (Manitowoc 888) to assist with offloading. Prep to receive barge. Stage equipment onsite.

**Days 2-3:** Receive / Assemble equipment, receive barge (day 3). Begin to prep barge for loading of counterweights and remainder of barge deck prep. Finalize loading counterweights into carts.

**Days 4-5:** Load counterweights via SPMT to barge. Continue barge prep and loading additional items.

**Days 6-7:** Finish deck prep and loading of additional items, set boom stand (additional items and boom stand to be set to barge with crane supplied and operated by KNES). Begin install of transport equipment under crane, prep for loading.

**Days 8:** Load Crane, set into final transport location. Begin lashing requirements.

**Days 9-13:** KNES to position boom and set down onto boom stand. KNES to begin steps to lower A Frame in prep for transport.

**Days 9-15:** Finalize lowering of A Frame and related items. Finalize Sea Bracing and lashing.

**Day 16:** Release barge for Tow towards Kittery. OXBO to clean up and demobilize from Manitowoc.

**Days 16-35:** The barge sails from Manitowoc, WI to Kittery, ME.

**Days 33-35:** Mobilize to Kittery, complete badging. Prep to receive barge.

**Days 35-40:** OXBO will receive barge at Portsmouth Naval Shipyard. KNES and OXBO to reset A Frame into operating position and related items (OXBO to provide crane and man lift). Remove lashing and sea bracing. Set up for offload.

**Days 41-42:** Offload crane, set to rails on maintenance spur.

**Days 42-45:** Remove transport equipment from main crane. Offload counterweights via SPMT. Counterweights to be picked from SPMT by Portal Crane #36 to assist with proposed acceptable ground loadings. KNES to install counterweights.

**Days 46-50:** The boom stand will be laid down and roughly secured for transit on the barge. OXBO equipment as feasible will be loaded to the barge for demob. The barge will be relocated to a secondary facility where the equipment will be removed, and the deck will be cleaned for release.

## 5.3 Required Working Hours

Due to several restrictions and tide requirements the necessary working days and hour are as follows. Final offload time is TBD pending actual arrival date.

- Days of the week – Monday through Sunday
- Hours per day – Estimated 12hr days, beginning at sunrise (actual start time TBD).

## 5.4 Barge Transport / Sea Bracing
Refer to (Section 2.4.3, 2.4.4)



# EXHIBIT D

## Andy Hulings

| | |
|---|---|
| **From:** | Andy Hulings |
| **Sent:** | Friday, February 26, 2021 3:38 PM |
| **To:** | 'Kurt Prange' |
| **Cc:** | Gregory Butts; Keith Settle; Christy Settle |
| **Subject:** | Scope of work -Timeline |
| **Attachments:** | Scope of Work - Revised.pdf; Schedule .pdf |

Kurt

Attached please find the updated scope of work and estimated general timeline.

Let me know if you have any questions or concerns.

Thank you

## Andy Hulings - Project Manager

Oxbo Mega Transport Solutions | NW Structural Moving | A Division of Oxbo, Inc.
P: 503.543.6696 | F: 503.543.6697 | C: 971.533.5328
PO Box 1148 | 33341 Gilmore Road | Scappoose, Oregon 97056 | www.oxboinc.com

 Please consider the environment before printing this e-mail.

*2124 DOC*

## Scope of work

OXBO will provide "Turnkey service" for the delivery of one (1) complete 140 ton single boom shipyard crane from Manitowoc, Wisconsin to Portsmouth Naval Shipyard in Kittery, Maine; while providing the required documents included below to satisfy the requests of involved parties.

This includes:

### 1. Formal transport manual
- Loading and unloading locations and support arrangements.
- Final loading/unloading sequence and timeline.
- Final stowage plan
- Final dunnage plan showing proposed blocking and sea-bracing.
- Final stability calculations for intact stability during voyage.
- Computer sea-keeping analysis to predict motion responses for the intended route and time of year. Analysis will include the inertial and gravity forces acting on the cargo center of gravity.
- Design forces of sea-fastenings (derived from the sea-keeping analysis plus an assumed "beam wind".
- Cribbing/blocking pressures (based on sea-keeping analysis)
- Analysis showing the maximum sustained sea state which the loaded vessel and cargo can withstand.
- A description of the method used to perform a check of sea-fastening at least once each day (24-hour period) while in transit.

### 2. Crane Loading, Unloading, and Transit Plan

OXBO shall submit a plan detailing the logistics involved in the transportation of the new crane. The plan includes a detailed sequence of lifts and rigging drawings with details of rigging equipment and methods of attachment to the component for installation. Actual location of center of gravity and location of points for completely assembled crane and for each major component shall be provided by KNES.

**Crane Loading in Manitowoc, WI.**

1. Fully Assembled 140-ton Portal crane will be positioned in front of the loading location by KNES prior to OXBO arrival.
2. Upon arrival Counterweights will be lowered to counterweight carts at an elevation acceptable for transport via SPMT prior to the crane being loaded. This activity will be performed by KNES with layout provided by OXBO.
3. Counterweights and carts will be loaded to the barge via SPMT and staged for securement.
4. Boom stand will be lifted with a shore crane and located on the barge in the location specified by OXBO. This activity will be performed by KNES.
5. Main hoist bottom block will be secured to the hoist stand and set to barge for transport. This activity will be performed by KNES.
6. Aux hoist bottom block will be secured to the boom for transport. This activity will be performed by KNES.
7. Main hoist drum will have the hoist rope removed and located on the shipping spool. This activity will be performed by KNES.
8. Additional members and tools will be set to barge by KNES. OXBO will provide location.
9. The main crane will be loaded to the barge with NO counterweights and set in transport location.  All activities related to the load out and securing to the barge are OXBO's responsibility.
10. Once the crane is located to its shipping position on the barge, the crane will be secured so that the crane cannot roll or move at its base. This activity is OXBO's responsibility.
11. The boom will then be rotated to the boom stand and lowered onto the support structure. Performed by KNES.
12. The A Frame laydown procedure will begin allowing the upper "A" frame to be retracted, the hydraulic cylinders will be activated allowing the "A" frame to retract into the stowed position. Performed by KNES.
13. Once in the stowed position, the retracted "A" frame will be secured by KNES for transport.
14. The Main boom will be secured to the boom stand by OXBO.
15. Final lashing procedures will be made, including Portal bracing, Upper Bracing and mics equipment lashing. OXBO will manage all lashing requirements.
16. Following completion of sea bracing and review, the barge will be released to sail.

**Transport from Manitowoc WI. to Kittery ME.**

1. The barge will be transported along the provided route.
2. Prior to arriving at the fixed overhead structures within the sea way the barge will be ballasted to accommodate the max height of 116'.
3. Included in the barge transport is required sea way fees and inspections.

**Offloading at Portsmouth Naval Shipyard**

1. Following arrival of the barge and staging at Berth 2 the A – Frame Upending sequence will take place in order to return the crane to operating position from stowed position. This activity will be performed by KNES.
2. OXBO will provide a man lift and crane support to complete removal and assembly of the temporary A – Frame components. Direction will be provided by KNES.
3. The Upper bracing, Portal bracing and lashing will be removed in prep for offload.
4. The crane will be offloaded from the barge, clear spanning the first 18' ONLY, (600psf restricted area).
5. Following the offload, the crane will be rotated, and side shifted over the top of the rails along the maintenance spur in berth 2. During this operation, the ground loading is anticipated to be a shadow pressure of 1.16ksf beneath the transport system.
6. OXBO will lower the crane on to the tracks and remove all transport equipment.
7. The counterweights will be offloaded via SPMT from the barge and staged along the water side of the crane. Required location due to shore power cabinet.
8. With the counterweights remaining on the SPMT the weights will be picked one at a time and installed in the crane. This will be performed by KNES. The counterweights must be picked from the SPMT to stay within the required ground loading of the area.
9. OXBO will remove and clean all securements from the barge deck.
10. KNES will be responsible for final assembly and operating work on the crane.
11. OXBO will finalize demob of the equipment and truck the KNES items back to Manitowoc WI.
12. KNES will offload incoming equipment in Manitowoc.

**Additional Information**

1. Ocean Marine Cargo insurance to be provided by KNES.
2. OXBO is providing $2,000,000 cargo insurance while the Crane in on land and being loaded.
3. Charterers insurance is not included in the contract price.
4. In the event that a delay is caused or standby is requested by Kone Crane, beyond the control of OXBO or its subsidiaries, a daily rate is charged at: Days 1-6: $34,970 Days 7-13: $45,170 Day 14+: $55,340
5. Zero elevation offload requires a clear pathway between bollards, roughly 50' wide, to allow for transport access.
6. Proposed turnover date is 4/23/21.

**Final Pricing**

**$3,522,715**

*. 50 DAYS*

**Portsmouth Naval Shipyard Crane #36 – 140T Portal Crane**

Below is an estimated general timeline for the sequence of events to relocate crane #36 from Manitowoc, WI to Portsmouth Naval Shipyard in Kittery, ME.

Day 1, 4/20: OXBO to provide material and layout to stage counterweight carts at elevated height for counterweight offload and transport via SPMT (optional to set on stands or SPMT pending timing).

Day 1, 4/20: Arrival to Manitowoc, WI facility. Begin to receive equipment. KNES to provide crane service within capacity of cranes onsite (Manitowoc 888) to assist with offloading. Prep to receive barge. Stage equipment onsite.

Days 2-3, 4/21-4/22: Receive / Assemble equipment, receive barge (day 3). Begin to prep barge for loading of counterweights and remainder of barge deck prep. Finalize loading counterweights into carts.

Days 4-5, 4/23-4/24: Load counterweights via SPMT to barge. Continue barge prep and loading additional items.

Days 6-7, 4/25-4/26: Finish deck prep and loading of additional items, set boom stand (additional items and boom stand to be set to barge with crane supplied and operated by KNES). Begin install of transport equipment under crane, prep for loading.

Days 8, 4/27: Load Crane, set into final transport location. Begin lashing requirements.

Days 9-13, 4/28-5/2: KNES to position boom and set down onto boom stand. KNES to begin steps to lower A Frame in prep for transport.

Days 9-15, 4/28-5/4: Finalize lowering of A Frame and related items. Finalize Sea Bracing and lashing.

*15 FROM TURN OVER* Day 16, 5/5: Release barge for Tow towards Kittery. OXBO to clean up and demobilize from Manitowoc.

*20 DAYS* Days 16-35, 5/5-5/24: The barge sails from Manitowoc, WI to Kittery, ME.

Days 33-35, 5/22-5/24: Mobilize to Kittery, complete badging. Prep to receive barge.

Days 35-40, 5/24-5/29-: OXBO will receive barge at Portsmouth Naval Shipyard. KNES and OXBO to reset A Frame into operating position and related items (OXBO to provide crane and man lift). Remove lashing and sea bracing. Set up for offload.

*8 DAYS* Days 41-42, 5/30-5/31: Offload crane, set to rails on maintenance spur.

Days 42-45, 5/31-6/3: Remove transport equipment from main crane. Offload counterweights via SPMT. Counterweights to be picked from SPMT by Portal Crane #36 to assist with proposed acceptable ground loadings. KNES to install counterweights.

Days 46-50, 6/4-6/8: The boom stand will be laid down and roughly secured for transit on the barge. OXBO equipment as feasible will be loaded to the barge for demob. The barge will be relocated to a secondary facility where the equipment will be removed, and the deck will be cleaned for release.

# EXHIBIT E

# OXBO

**INVOICE #**
**21-2740**

**Oxbo Mega Transport Solutions**
A Division of Oxbo, Inc.
PO Box 1148
Scappoose, OR  97056
P: 503.543.6696 | F: 503.543.6697 | www.oxboinc.com

| | | |
|---|---|---|
| **BILL TO** | Konecranes Nuclear Equipment<br>16545 W Beloit Rd<br>New Berlin, WI 53151-7365 | **PROJECT INFO** 140 Ton Crane Move<br>Portsmouth Naval Shipyard<br>2 Wentworth St<br>Kittery, ME 03904 |

| PO NUMBER | INVOICE DATE | TERMS | DUE DATE | CUSTOMER ID | OXBO JOB # |
|---|---|---|---|---|---|
| 4502501475 | 12/1/2021 | Net 30 | 12/31/2021 | KONNUC01 | 20-0883C |

| DESCRIPTION | RATE | | AMOUNT |
|---|---|---|---|
| Twenty one day delay from contract turnover date to date crane was set on rails in Portsmouth.<br>Days 1 through 6 = $34,970.00/day = $209,820.00<br>Days 7 through 13 = $45,170.00/day = $316,190.00<br>Days 14 through 21 = $55,340.00/day = $442,720.00 | 968,730.00 | | 968,730.00 |
| Three day delay charge for Oxbo not being able to work 07/03, 07/04 & 07/05/2021, as per Naval Base protocol caused directly by KNES delay<br>Days 22 - 24 (cummulative) = $55,340.00/day = $166,020.00 | 166,020.00 | | 166,020.00 |
| Three additional days of use for Astro 600T Crane<br>6/18, 6/25 & 6/26/2021 - $29,260.00 | 29,260.00 | | 29,260.00 |
| Steel plate rental necessary to overcome inadequate ground pressure rating as per contract - $12,075.00 | 12,075.00 | | 12,075.00 |
| Additional Engineering necessary to reverse loadout procedure and ballasting plan due to KNES inability to load equipment in sequence as planned - $6,000.00 | 6,000.00 | | 6,000.00 |
| Modification to front tie beam to match incorrect hole pattern in the crane provided by KNES - $4,600.00 | 4,600.00 | | 4,600.00 |
| Delay charges for assist tugs that were necessary for exiting the bay in Manitowoc and navigating the Welland Canal - $44,878.75 | 44,878.75 | | 44,878.75 |

**TOTAL AMOUNT**    **1,231,563.75**

Any account not paid on the terms stated on the invoice will be placed on cash terms until the account is paid.  Interest shall accrue on all portions of the account not paid within the terms of the date billed at a rate of 1½% per month or 18% APR. This includes any collection agency fees, attorney fees and/or court costs, if any.